# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No.:**  15-CR-00067-RDM |
| | : | |
| v. | : | |
| | : | |
| **MIR ISLAM,** | : | **Plea Proceedings:**  July 6, 2015 |
| | : | |
| **Defendant.** | : | **Filed Under Seal** |

**FILED**

JUL 0 6 2015

Clerk, U.S. District and
Bankruptcy Courts

## STATEMENT OF THE OFFENSE

Had this case proceeded to trial, the United States of America would have established the

following facts beyond a reasonable doubt:

### I.   Count One: The "Exposed" Conspiracy

A.  Summary of the Conspiracy

1.    The "exposed" conspiracy included at least five coconspirators, including Mir

Islam who resided in New York City.   Two of the coconspirators resided in Southern California,

one resided in Fredericksburg, Virginia, and one resided in the country of Finland.   The

overarching purpose of the conspiracy was to perpetrate two abuses, known in the jargon of the

conspirators as "doxing" and "swatting," against multiple victims.   "Doxing" is the act of

gathering, by licit and illicit means, and posting on the Internet personal identifying information

("PII") and other sensitive information about an individual, including, for example, addresses,

dates of birth, social security numbers, telephone numbers, email addresses, credit information,

employers, and details regarding the individual's children and other family members.   "Swatting"

is the act of placing emergency calls to police departments, usually through Internet-based

telecommunication relay services, to make false claims of homicides or other assaultive conduct

by other individuals, or false claims of burglaries and assaultive conduct against other individuals,

at the residences (or other locations) of those individuals which calls are intended to result in, and usually do result in, a tactical police response to the targeted individuals' residences (or other locations).

2.     Mir Islam and his coconspirators selected their victims, that is, those whom they intended to "dox" and/or "swat," on the basis of ideological, political, or personal animus against those individuals, or because they thought doxing or swatting a certain individual would draw public and media attention, not to themselves personally, but to their conduct including to their "exposed" websites where the PII of the doxed individuals was posted.   At a later point in the conspiracy, in response to media attention to the exposed websites and the swatting, some of the conspirators conceived of using the exposed website to earn money by sponsoring advertisements on the site.

3.     The conspiracy commenced no later than February 2013 when members of the conspiracy began to collect the PII for those they intended to "dox."   The conspiracy terminated the first week in September 2013 when Agents from the Federal Bureau of Investigation executed search warrants upon the residential premises of some of the members of the conspiracy.

B.   The Exposed.su Website

4.     On or before March 11, 2013, a website with the URL[1] "exposed.su" became accessible to the public on the Internet.   Exposed.su was the first website used by Mir Islam and his coconspirators to commit the abuse of doxing.   The home page of the website consisted principally of the names of numerous high-level present and former government officials as well as various celebrities.   Approximately 37 individuals were named.   Next to the names of some of the government officials, in parentheses, were the respective government positions of those

---

[1] "URL" stands for Uniform Resource Locator and refers to a website address using the HTTP/HTTPS protocol.

individuals.

5.      Each of the names listed on the exposed.su website was a link to other content pages on the website that were accessible to anyone visiting the site.   The content pages on the website contained PII for each of the individuals listed on the site.   The PII usually included, variously, social security numbers; dates of birth; phone numbers; present and previous physical addresses; and photographs.   For most of those individuals listed on the website, the PII also included financial credit reports.   So, for example, if persons visiting the website exposed.su clicked on one of the names/links, they would have been transferred to a webpage normally containing the social security number, date of birth, phone number, address, photograph, and previous addresses for that named individual.   They would also usually have been instructed to "**Click here** to view [individual's] Credit Report."   Clicking on that link would have transferred the viewer to a different content page on the site that contained a financial credit report for that individual.   None of those whose PII was posted on the exposed.su website consented to the disclosure of that information.

6.      The exposed.su website was hosted on one or more servers located in The Netherlands.   Public access to the website was through a "proxy" server, however, which masked the actual location of the webserver.   On March 16, 2013, the following comments appeared on the exposed.su website:

> *Hello Everyone, this is our final message.   Behind this jolly visage of rainbows and top hats, we are people.   People with a preference for music, a preference for food; we have varying taste in clothes and television, just like you. Even Hitler and Osama Bin Laden had these unique variations and style, and isn't that interesting to know?   We have enjoyed every minute of the past 12 days of providing entertainment and laughs to all of you, sadly it's time to say bon voyage – we hope – inspiration, fear, denial, happiness, approval, disapproval, mockery, embarrassment, thoughtfulness, jealousy, hate, even love.   IF anything, we hope we had a microscopic impact on someone, somewhere.   Anywhere.   From Russia*

3

*with Love, Exposed.su.   Contact exp0s3d[at]tormail.org fpr final comments*

Within days of this message appearing on the site, exposed.su went offline.

C. The Exposed.re Website

7.      On or about April 2, 2013, another "exposed" website was launched by the

conspirators, including Mir Islam, with the URL "exposed.re."   The site was eventually, in

practical terms, identical to the exposed.su site, with at least three exceptions.   The first was that

the site contained additional names and associated PII.   Second, immediately adjacent to some of

the names on the site, inside brackets, was the term "Swatted."   These individuals, along with

others named on the exposed.re website without the "Swatted" reference, and still others not

named on the website, were in fact "swatted" by members of the conspiracy in furtherance of the

conspiracy alleged in Count One of the Information.   Finally, the conspirators attempted to

monetize the exposed.re website by creating a "Linkbucks" account.   Linkbucks is a social

advertising and marketing network that allows subscribers to earn money, in various ways, from

visitors to a website.   None of those whose PII was posted on the exposed.re website consented to

the disclosure of that information.

8.      Like the site exposed.su, exposed.re was proxied to hide the location of its

webserver which was Malaysia.   On April 22, 2013, Malaysian authorities took the exposed.re

website offline.

D. The Exposed.ws Website

9.      On or about July 22, 2013, a third "exposed" website was launched by some of the

conspirators, including Mir Islam, this time with the URL "exposed.ws."   The site was similar in

design and content to the exposed.su site, and was again proxied to hide the locations of its

webservers which were Latvia, the United Kingdom, and/or Ukraine.   The site was taken offline

sometime before August 12, 2013.

10.     On or about August 12, 2013, a coconspirator uploaded a file to a webserver located in the District of Columbia.   This was an undercover webserver, controlled by United States law enforcement.   The webserver hosted the website "exposed.ws," which was intended by the coconspirator to be another iteration of the exposed.ws website previously hosted by servers in Latvia, the United Kingdom, and/or Ukraine.   The coconspirator uploaded the file to a folder on the webserver named "exposed.ws," and the file contained many of the same names and PII as those posted on the exposed.su and exposed.re websites.   United States law enforcement authorities prevented this website from going online.

E.   Acquisition of PII posted on Exposed Websites

11.     The PII posted on the exposed websites by the conspirators was obtained, expressly for the purpose of such posting, predominantly in the following manner.   In about February and March 2013, members of the conspiracy collected personal information about their targets from open source websites.   To obtain the social security numbers, dates of birth, and addresses of their targets, the conspirators usually resorted to the websites SSNDOB.ru and SSNDOB.ms (collectively "SSNDOB").   SSNDOB was a website that collected from computer intrusions and other means PII, including social security numbers, dates of birth, last known addresses, and associated identities, belonging to individuals located around the world, including within the United States.   SSNDOB sold this PII online.   The conspirators, including Mir Islam, in some cases used the online money transfer service known as WebMoney Transfer to pay for the SSNDOB PII, but in most instances they were able to obtain the SSNDOB PII without paying a fee due to Mir Islam's and another conspirator's association with SSNDOB's owner/operator.   The number of social security numbers ultimately obtained by members of the conspiracy and used to

5

obtain credit reports greatly exceeded 15.

12. Once the conspirators obtained the social security numbers, dates of birth, addresses, and any other personal information they could learn about their intended victims, the conspirators used that PII and the Internet to attempt to obtain, fraudulently and without authorization, the victims' consumer credit reports. In most instances, members of the conspiracy obtained credit reports through credit report websites like annualcreditreport.com, which charged no fees. To obtain a victim's credit report from annualcreditreport.com, a conspirator created a fake user account on the website, entering into the site the name, social security number, date of birth, and address of the intended victim. The conspirator was then permitted to select from various credit reporting agencies to obtain the desired credit report. Once the conspirator selected a particular credit reporting agency, such as Equifax, Experian, or TransUnion, the conspirator was transferred to that credit reporting agency's server whereupon the conspirator was prompted to reenter the name, social security number, date of birth, and address of the individual whose credit report was sought and whom the conspirator was fraudulently representing to be. The conspirator then had to answer a series of multiple choice security questions. If the conspirator answered the questions correctly, either as a result of information the conspirator learned about the target or by guesswork, the conspirator was granted access to and downloaded the victim's credit report from the respective credit reporting agency's server. If the conspirator failed to answer the questions correctly, he was eventually prevented from further attempts through the chosen credit reporting agency and the conspirator simply went back to the annualcreditreport.com website and selected another credit reporting agency to try the process again. On some occasions when the conspirators were unable to obtain a free credit report of an intended doxing victim, they were able to obtain the report from a website that charges a fee for the reports, where the security questions

6

are often easier to answer.   As with other fees incurred in furtherance of the conspiracy, to pay the

fee for these credit reports, the conspirators used stolen credit card account information.   In this

manner, the conspirators, including Mir Islam, were able fraudulently to obtain from various credit

reporting agencies, including Equifax, TransUnion, and Experian, the consumer credit reports of

most of the individuals doxed on the exposed websites, and to post those credit reports on the

exposed sites.   Equifax, TransUnion, and Experian are "consumer reporting agencies" as used

and defined in Title 18, United States Code, Section 1030(a)(2)(A), and Title 15, United States

Code, Section 1681a(f).

F.   The Swattings

13.     As part of the conspiracy alleged in Count One of the Information, and in

association with the conspirators' doxing, members of the conspiracy, including Mir Islam,

committed swats against various individuals.   As stated above, the motives for the swats varied

depending upon the target but generally consisted of ideological, political, or personal animus;

amusement; a desire for media attention; and/or revenge.   For example, on March 14, 2013,

members of the conspiracy swatted an author who writes a blog addressing cybercrime, among

other topics, in part because the author wrote critically of the exposed.su website.   Members of

the conspiracy swatted a then-California State Government official (identified herein by the

initials "T.L.") on April 19, 2013, in retaliation for his work on legislation in California to increase

penalties for swatting.

14.     In addition to the foregoing, on April 27, 2013, members of the conspiracy

committed a swat against a then-United States Government official from the State of Michigan and

an officer or employee of the United States under Title 18, United States Code, Section 1114

(identified herein by the initials "M.R.") in retaliation for his work, in the performance of his

official government duties, on Federal legislation related to cyber-attacks known as the "Cyber Intelligence Sharing and Protection Act" (CISPA).   Using AT&T Corporation's telecommunications Internet protocol relay services, a conspirator communicated a false emergency at M.R.'s residence to local police in Michigan.   As in most swats generally, and those committed in furtherance of the instant conspiracy particularly, this communication was contrived to appear as though it was being made by someone, in this case M.R., from inside the location to which the swatter intended the police to respond.   The communication received by the Police Department included the following excerpts:

> Male adv he is immortal.   He is making a pentagram w candles in his room. This is my kingdom.

> Male states Satan told him the police don't deserve to live & he should kill them all Satan is always right.

> Male states hail Satan hail Satan the mark of the beast I drew 66 on my chest and head with my blood.

> Male adv last night he talked to Satan told him he would get anything he wanted if he did this & killed as many people as he wanted.   He wants to die with his wife.

> He built 5 explosives & thinks he did a very good job.   Male adv he looked on the internet to see how to build explosives male adv he put his wife in a bag & she has been dead for awhile.   Male still has the weapon in his hand.   Gun is a 45 pistol.

> Wife is not breathing.   Male adv they were arguing & one thing lead to another & he shot her.   He shot his wife & he doesn't know why.

A local Special Weapons and Tactics ("SWAT") Team responded to the false communication, forcibly entering the residence of M.R.   In clearing the residence, the SWAT Team found no one inside at the time and no evidence of any wrongdoing.

15.     On March 31, 2013, members of the conspiracy committed another swat, this time against a United States Government official working in the Commonwealth of Massachusetts and

an officer or employee of the United States and of an agency in a branch of the United States

Government under Title 18, United States Code, Section 1114 (identified herein by the initials

"S.H."). S.H. was swatted by the conspirators in retaliation for S.H.'s participation in the

investigation and prosecution of a cyber-crime case, in the performance of S.H.'s official

government duties. Using Sprint Corporation's telecommunications Internet protocol relay, a

conspirator communicated a false emergency at S.H's residence to local police in Massachusetts.

Again, this communication was contrived to appear as though it was being made by S.H. from

inside his residence which was the location to which the swatter intended the police to respond.

The communication to the Police Department included the following excerpts:

> Hello my wife is dead. I shot her and now she's dead. I don't know what to do.

> I am having suicidal thoughts and also homicidal thoughts so I went in my garage and shot her while she was sleeping.

> She's been dead for hours. I cut her up and tried to hide her in my yard but I feel guilty. My name is []. My wife is []². 

> I really just feel like killing myself for what I have done. I had way too much to drink tonight and I've been depressed and my wife was talking about divorcing me.

> I'm having thoughts of hurting people and I don't know what to do. If anyone comes in my house I might shoot them.

> If any police come in my house I will shoot them. I swear on my wife's dead body that's hidden in my closet.

> I am just letting you know now if I see any police outside of my house I will start shooting.

> I will not be taken alive. Mark my words. I am not going to prison for the rest of my life. I will not. Don't worry about where I am at in the house. If any cops are outside in my yard or on the street I will start shooting.

---

² The conspirator committing the swat correctly identified the names of S.H and S.H.'s wife.

By the way I have my police scanner right next to me and I can hear everything and you guys think I'm joking. I will shoot anyone who comes near my property.

If I take long to reply it's because I'm ready to shoot some cops if they come by my house.

I see cars outside my house I swear I will shoot. I am not playing. I am not fucking around. I will shoot them.

I am an attorney. My wife says I take my job too seriously and that I'm a looser. That's why I shot her.

You know I work with the police a lot but I am not afraid to shoot them. That's why I giving you a warning. If I see them come in my home a I will shoot. Now I'm going to disconnect and prepare myself. Goodbye.

Numerous police officers from the Police Department responded to the home of S.H. at approximately 1:00 a.m. Three of the responding officers had their service weapons drawn as they approached and inspected the residence. S.H. was home at the time, along with his wife. Officers ordered S.H. to raise his hands upon demanding entry into the home. After entering the home, the officers questioned S.H., cleared the premises, verified the safety of S.H.'s wife, and eventually determined that there had been no wrongdoing.

16.     On April 4, 2013, members of the conspiracy also committed a swat against an individual identified herein by the initials "W.L." at W.L.'s residence in Virginia because one or more conspirators opposed W.L.'s opinions on the issue of gun control. In communicating the false 9-1-1 report, the conspirator stated that he had shot his wife and that if the police responded he would not be taken alive and that he would shoot the police. Similarly, on April 27, 2013, members of the conspiracy swatted an individual identified herein by the initials "W.B." at W.B.'s residence in Maryland, and the conspirator making the false 9-1-1 communication stated that he had shot his wife, that he had a gun, that he would execute anyone who responded, and that he would not be taken alive.

17.    The term "swatting" derives from the SWAT teams, or other heavily armed law enforcement units, that, as described above, sometimes respond to the false emergency calls.   The conspirators used telecommunications Internet protocol relay services, sometimes referred to as "TTY Relay Services," to communicate the "emergencies" because the relay services, in effect, anonymized the "calls."   To make what amounts to a "9-1-1 call" via Sprint's, AT&T's, or other similar relay services, the conspirators used their computers or cell phones to send the message in written form over the Internet to the relay service.   The relay service then orally communicated directly with either the National 9-1-1 Transfer Center or the appropriate local 9-1-1 emergency dispatch center to convey the information received by the relay service from the conspirator. These telecommunication relay services were designed, in part, to aid the hearing or speech impaired to seek emergency assistance.   Because the communications to the relay services traveled over the Internet, the conspirators were able to use virtual private networks[3] or botnets[4] to hide their Internet Protocol addresses and make it appear as though the communications originated from someplace else.   Indeed, the Internet protocol address from which the swat of S.H. appeared to have been transmitted was associated with a router located in Revere, Massachusetts.   The storylines used by the conspirators in their swats frequently included references to someone committing a violent act, or being the victim of a violent act, that included

---

[3] A virtual private network, or "VPN," in basic terms, routes Internet communications through multiple intermediary nodes to the communication's true destination.   These intermediary nodes consist of a network of computers that can be located anywhere in the world.   The IP address of the last or "exit" node will appear to the recipient of the communication as the originating source of the communication, like a proxy.

[4] A "botnet" is a collection of compromised computers, known as "bots," that autonomously respond to and execute commands issued by the botnet's owner, often for nefarious purposes.   Computers become part of a botnet by being infected with malware, which may install itself on a user's computer without the user's knowledge, often by taking advantage of web browser vulnerabilities or by tricking the user into running a Trojan horse program.   Once the computer is infected and becomes a bot in the botnet, the malware can listen for, respond to, and execute commands issued by the botnet's owner, for example, to send out messages to a telecommunications relay service.

the use of firearms, and in some cases explosives, to ensure that the response by law enforcement was heavily armed and dramatic.   For similar reasons, the conspirators also sometimes threatened to shoot responding officers, as they did in the S.H., W.L., and W.B. swats.

G.  Mir Islam's Participation in the Conspiracy

18.      Mir Islam participated in nearly all facets of the conspiracy, including the fraudulent procurement of credit reports for posting on the exposed websites, the creation of the exposed websites, and the swatting.   Islam participated with other conspirators in conceptualizing the exposed websites, choosing doxing and swatting victims, and more generally, executing the broad contours of the conspiracy.   He assisted, to a small degree, in the creation of the appearance of the exposed websites.   Islam's contribution to the creation of the exposed websites was relatively small because he was less adept at coding than some of his coconspirators.   Islam chose specific individuals to be doxed and swatted.   He purchased the PII of several victims from the website SSNDOB, and he pulled credit reports from pay-for-report sites for a number of victims. Islam also contacted a specific celebrity media entity to alert the entity to the conspirators' doxing and swatting activities to promote media reporting about the activities.   The media entity with whom Islam communicated did in fact report on some of the doxing and swatting activity committed by the conspirators.

19.      Islam participated in the swat against the author referred to in paragraph 13, above[5]. On about March 13, 2013, the author posted an article on his website in which he noted that Social

---

[5] The conspirators in some cases jointly committed swats against individuals by remotely accessing the computer from which the swat was being committed through the use of remote access software like Join.me and TeamViewer.   For example, a number of swats were committed from a computer owned by one of the coconspirators located in Southern California.   Islam, and other conspirators, using Join.me or TeamViewer, could remotely access that same computer and view and/or control it as if they were sitting in front of it.   Islam participated in the swat against the author in this manner.

Security numbers and other sensitive personal information relating to numerous individuals had

been published online, a reference to the exposed.su website.   The article included a redacted

screenshot of the exposed.su website, illustrating the PII disclosed on exposed.su.   The article

also discussed the website SSNDOB.ru, reporting that for various fees one could obtain, among

other information, credit reports, drivers' license records, social security numbers, dates of birth,

addresses, and phone numbers.   Due in part to this reportage, the conspirators assumed the author

was responsible for a distributed denial of service attack that had been launched against the

exposed.su website.[6]   In retaliation, Mir Islam and other coconspirators swatted the author at his

residence on March 14, 2013.   The swat was transmitted through an Internet relay service to local

police in Virginia, and conveyed information that "4 Russian men broke into" his home "and shot

[his] wife in the chest."   The communication further claimed that "one of the men plant[ed]

something looking like an[] explosive device or claymore[7] by the door."   Local police responded

to the author's residence.   The author later related on his website what ensued, reporting as

follows:

> When I opened the door . . . , I heard someone yell, "Don't move!   Put your hands
> in the air."   Glancing up from my squat, I saw a [] Police officer leaning over the
> trunk of a squad car, both arms extended and pointing a handgun at me.   As I very
> slowly turned my head to the left, I observed about a half-dozen other squad cars,
> lights flashing, and more officers pointing firearms in my direction, including a
> shotgun and a semi-automatic rifle.   I was instructed to face the house, back down
> my front steps and walk backwards into the adjoining parking area, after which
> point I was handcuffed and walked up to the top of the street.

Officers cleared the author's house and found no evidence of wrongdoing.   That same day, Mir

Islam sent the author an email in which Islam purported to be an FBI Agent, accusing the author of

---

[6] A distributed denial of service attack, or "DDoS" attack, against a website is an attempt to render the website
inaccessible and inoperable by overwhelming the site with Internet visits and queries.

[7] A Claymore is a type of military explosive.

illegally promoting the services of SSNDOB.ru through the author's reporting about the

SSNDOB.ru website on the author's website, and demanding that the author's website be shut

down.   The conspirators also launched a DDoS attack against the author's website.

H.   Other Coconspirators' Participation in the Conspiracy

20.      Two of the principal coconspirators, identified herein as coconspirator 1 (initials

E.T.) and coconspirator 2 (initials D.C.), resided in Southern California, and at all times during the

commission of the above-described activities were under the age of 18.   Coconspirators 1 and 2

conceived of the exposed website, the doxing, and the swatting, along with Mir Islam.

Coconspirators 1 and 2 performed the computer programming for the exposed website to create

the website and its contents and to secure it.   Coconspirator 1 performed most of the work in

building and designing the exposed website, managed its HTML, and posted most of the stolen

credit reports on the website.   Coconspirators 1 and 2 selected the photographs of the victims

depicted on the website.   Both coconspirators obtained credit reports, without authorization, from

the credit reporting agencies to be posted on the exposed site.   Coconspirator 3 (initials T.W.)

resided in Fredericksburg, Virginia, and was also under the age of 18 during the commission of the

above-described activities.   Coconspirator 3 pulled credit reports for posting on the site and

initiated the creation of the last iteration of the website, exposed.ws.

21.      Coconspirators 1 and 2 both committed swats against numerous individuals in

furtherance of the conspiracy charged in Count One of the Information.   Oftentimes, they

committed the swats jointly through coconspirator 2's computer, as described in footnote 5, above.

Coconspirators 1 and 2 jointly participated in the swat against the author, among others, and

coconspirator 2 committed the swat against S.H., among others, as described above.

**II.**     **Count Two: Conveying False Information Concerning Use of Explosive**

22.     On March 22, 2013, Mir Islam falsely reported a shooting and explosives incident on the campus of a university in Arizona.   Using Sprint Corporation's telecommunications Internet protocol relay, between about 4:00 and 5:00 p.m. local time in Arizona, Islam, then in New York, New York, used a cell phone to convey his false report to the relay operator via text messaging.   In his false report, Islam identified himself as a female.   Islam's communication was relayed by the Sprint operator to the National 9-1-1 Transfer Center, and then forwarded to local, Arizona 9-1-1.   The information initially received by local, Arizona 9-1-1 was, "her friend has a gun and a rifle and is shooting people on campus."   Islam terminated his connection to the Sprint relay operator and then reestablished communication at approximately 5:00 p.m. to continue his false report.   Islam stated to the relay operator via text messaging, "OMG OMG where are the Police . . . he is shooting up the area . . . he is going to blow up the buildings . . . he has explosives."   Islam informed the relay operator that the shooter was a friend named "TJ Mitch."   This information was also conveyed to local, Arizona 9-1-1.

23.     In response to Mir Islam's false report of a shooter and explosives on the university campus, the local police, university police, and the FBI responded to the campus to investigate. The response by the local Police Department included numerous officers, SWAT Teams, and the Police Department Bomb Squad.   The university's administration building was evacuated and searched, and the campus was placed in lockdown, with flash text messaging sent to the student population advising of a potential active shooter situation.   Ultimately, the administration building was cleared, no suspects were located, and no explosives were found.   Responding law enforcement units began to leave the campus at approximately 9:30 p.m.

24.     At approximately 9:50 p.m. Islam made another false emergency call through the Sprint relay, this time claiming that a man located on the same university campus was holding a

rifle to the head of a woman and was going to kill her if he did not receive $50,000 in ransom. Islam further stated that the male had placed explosives in eight campus buildings and was going to blow them up and start shooting.   In light of the previous false report, authorities investigating that report assumed this second threat was part of the same course of conduct and also false.

25.     Mir Islam made the false shooting and explosives report because Islam was obsessed with a woman, identified herein by the initials "A.R.T.," who was then a student at the university and whom Islam believed had spurned his continued attempts to contact her.   A.R.T. was a cheerleader at the university.   Another cheerleader at the University with whom A.R.T. conducted cheerleading was an individual with the initials "T.E.M."   T.E.M. was identified by A.R.T. as "TJ Mitch" on A.R.T.'s Facebook page to which Islam had access.   In Islam's false report, "TJ Mitch" was the name provided by Islam of the shooter and the individual intending to set off explosives.

### III.     Count Three: Cyberstalking

26.     Beginning in about March 2013 and continuing through at least July 2013, Mir Islam engaged in a campaign of harassment against A.R.T., the student at the university in Arizona, described above in Section II, which Section is incorporated herein by reference. Though Islam had never met A.R.T., he developed a romantic obsession with her through the Internet.   Islam harassed A.R.T. to attempt to coax and coerce A.R.T. to communicate with him; to obtain information about A.R.T.; in retaliation for A.R.T.'s refusal to communicate with him; and to intimidate and cause substantial emotional distress to A.R.T.

27.     Mir Islam learned about A.R.T. and acquired information about her from Internet searches.   He knew that A.R.T. was a student and cheerleader at the university.   Islam communicated the false shooting and bomb threat at the university on March 22, 2013, because he

expected A.R.T. would be affected, disturbed, and upset by the threats.   Shortly before making

those threats, Islam called a university facility dedicated to honoring the university's athletes and

athletics programs, and spoke to a receptionist.   Islam identified himself as a Police Officer

named "Thomas Ryan," and requested a cell phone number for A.R.T., whom he identified as a

cheerleader at the university.   The receptionist refused to provide Islam the number, but A.R.T.

was apprised of the inquiry and was disturbed by it.

28.     Mir Islam did eventually obtain the cell phone number for A.R.T., as well as for

three other students and cheerleaders at the university, one of whom, identified herein by the

initials "M.A.G.," was a friend of A.R.T.   Over the course of several months, beginning in about

April 2013, Islam repeatedly called or sent text messages to A.R.T., M.A.G., and the other two

students, masking his own cell phone number through various means.   The calls and text

messages received by A.R.T. from Islam were uninvited and unwanted; they were annoying and

eventually alarming and threatening.   Islam also sent harassing emails to A.R.T. at A.R.T.'s Cox

communications email account.

29.     Towards the end of April, Mir Islam began frequently calling and sending text

messages to the cell phone of M.A.G.   Some nights, Islam sent as many as 30 text messages to

M.A.G.   In one such call, on about May 1, 2013, Islam stated to M.A.G. that he was an FBI Agent

dealing with a case about a friend of hers whom Islam identified by a nickname as A.R.T.   Islam

stated he needed some information for the investigation.   When M.A.G. hung up, she received

numerous text messages from Islam containing her social security number.   In still other text

messages to M.A.G. on other occasions, Islam identified himself as "Batman" or "TJ," and stated

that he had personal information about M.A.G. that Islam would release unless M.A.G. provided

Islam information about A.R.T.   Islam sent similar text messages to two other student

17

cheerleaders, seeking information about A.R.T.   These text messages and calls were reported to the FBI, and M.A.G. and the other student cheerleaders informed A.R.T. about them.

30.      Sometime on or before July 17, 2013, through social engineering techniques, Mir Islam acquired unauthorized access to A.R.T's Cox Communications email account.   To acquire this unauthorized access, Islam used a VPN or a botnet, defined above in Section I, to mask his identity, and Cox Communication's records indicated that the unauthorized access occurred from Sweden.   Upon gaining unauthorized access to the account, Islam changed the password to A.R.T.'s account, thereby denying her access to her account.   On or about July 17, 2013, Islam socially engineered into, and obtained unauthorized access to, A.R.T.'s Facebook and Instagram accounts, changing the passwords to those accounts too.   Islam downloaded personal photographs of A.R.T. from her Facebook and Instagram accounts and stored them on a cloud server from which the FBI later recovered them in a file name that bore A.R.T.'s nickname.   Within the same time frame, Islam created a Facebook page of his own in which he assumed the false identity of "Adrian Cosgrove," including photographs of someone other than Islam, and pretended to be a student attending A.R.T.'s university.   Islam used this Facebook account and identity to send a "friend" request to A.R.T.'s Facebook account.   Islam also created fake Twitter accounts in the nickname of A.R.T.

31.      To further harass A.R.T., in or about April 2013, Mir Islam created false home and auto loan applications and credit card applications under the name and identity of A.R.T. that appeared on A.R.T. credit reports obtained from Experian.

32.      Mir Islam's continued harassment of A.R.T. profoundly affected A.R.T.   It caused A.R.T. a great deal of emotional distress, anxiety, and fear for her safety, and caused A.R.T. to alter her behavior and seek counseling.   A.R.T. feared the source of her harassment may have

been physically stalking her, and she feared she was subject to attack and physical injury,

including in her own place of residence.   She sought escort from campus security after studying

late for fear of personal attack.   A.R.T. considered withdrawing from the university, abandoning

cheerleading, and moving away from the area in which her university was located.   At times, the

entire cheerleading squad held meetings with the local Police, the FBI, and the university to

discuss the threats and security concerns.   The incidents affected A.R.T.'s ability to concentrate in

school, disrupted her sleep, and made her paranoid that she was being watched by someone at any

given time or location.   Members of A.R.T's family at times had to stay with her to comfort her.


Respectfully submitted,

VINCENT H. COHEN, JR.
Acting United States Attorney
District of Columbia

By:

CORBIN A. WEISS
Assistant United States Attorney
Cybercrime Unit
California Bar No. 122961
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-1718
corbin.weiss@usdoj.gov

I declare under penalty of perjury that the foregoing is a true and accurate statement of
facts.

**MIR ISLAM**
Defendant